**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.S. *et al.*,<br>          Plaintiffs,<br><br>     v.<br><br>DISTRICT OF COLUMBIA,<br>          Defendant. | Civil Action No. 21-0293 (CKK) |

**MEMORANDUM OPINION**
(March 22, 2022)

Plaintiffs J.S., a student eligible for special education services in the District of Columbia, and his parents, A.D. and T.S. ("Plaintiffs") bring this action seeking judicial review of a Hearing Officer's Determination following an administrative due process hearing under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*.  Plaintiffs contend that the District of Columbia ("Defendant" or "the District") denied J.S. a free appropriate public education for the 2020–2021 school year by proposing an inappropriate placement for him at the Hughes Center in Danville, Virginia.  The District argues that its proposed placement was appropriate.  Presently before this Court are Plaintiffs' [23] Motion for Summary Judgment and Defendant District of Columbia's [24] Cross Motion for Summary Judgment.  Upon consideration of the parties' pleadings,[1] the relevant legal authorities, and the record as a whole, the Court shall **DENY** Plaintiffs' [23] Motion for Summary Judgment and **GRANT** Defendant's [24] Cross Motion for Summary Judgment.

---

[1] The Court's consideration has focused on: Plaintiffs' Motion for Summary Judgment, Memorandum in Support thereof, and Statement of Undisputed Material Facts ("Pls.' Mot."), ECF No. 23; District of Columbia's Opposition and Cross Motion for Summary Judgment ("Def.'s Cross-Mot. & Opp'n"), ECF No. 24; Plaintiffs' Opposition to Defendant's Cross Motion and Reply ("Pls.' Reply & Opp'n"), ECF No. 26; Defendant's Reply to Plaintiff's Opposition to Defendant's Cross Motion ("Def.'s Reply"), ECF No. 28; and the record in this case, including the Administrative Record ("A.R."), ECF Nos. 10–14.  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

1

## I.   BACKGROUND

### A.  Statutory Framework

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  Once a child is identified as disabled, the school district must convene a meeting of a multi-disciplinary team to develop an individualized education program ("IEP") for the student.  *See* § 1414.  The IEP must include a variety of information, including the child's current levels of academic achievement and functional performance, measurable annual goals, how the child's progress towards the goals will be measured, and the special education and related services to be provided to the child. § 1414(d)(1)(A)(I).  The IEP must be formulated in accordance with the terms of the IDEA and "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 204 (1982).

Once the IEP is developed, the school system must provide an appropriate educational placement that comports with the IEP.  *Alston v. Dist. of Columbia*, 439 F. Supp. 2d 86, 90 (D.D.C. 2006).  "If no suitable public school is available, the school system must pay the costs of sending the child to an appropriate private school."  *Dist. of Columbia v. Vinyard*, 901 F. Supp. 2d 77, 80–81 (D.D.C. 2012) (quoting *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005)).  However, a parent or guardian who "unilaterally places a child with a disability in a private school," without consent of the school system, "does so at his or her own risk."  *Florence Cty. Sch.*

*Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *School Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 372 (1985)).

The IDEA guarantees parents of disabled children the opportunity to participate in the evaluation and educational placement process. *See* § 1415(b)(1). If the parent of a child receiving services pursuant to the IDEA believes his or her child's IEP or school placement is inadequate, the parent may file a "due process complaint." *See* § 1415(b)(7)(A); § 1415(k)(3).

**B. Factual Background**

J.S. has been diagnosed with Autism Spectrum Disorder ("ASD"), Attention Deficit Hyperactivity Disorder ("ADHD"), Combined Type, Bipolar Disorder, and Anxiety Disorder, as well as specific learning disabilities in reading and written expression. Compl. ¶ 7; *see* AR 189, 294. Despite these challenges, J.S. is described as "academically gifted." *See* AR 35. J.S. has been found eligible for special educations services by the District of Columbia Public Schools ("DCPS"). Compl. ¶ 8.

J.S. has a "long history of psychiatric and learning difficulties." *See* AR 189. He was diagnosed with ADHD in 2008, with Asperger's Syndrome in 2010, and with a Pervasive Developmental Disorder, Executive Dysfunction, an Anxiety Disorder, an Expressive Language Disorder, a Developmental Coordination Disorder, and a Disorder of Written Language in 2011. *See* AR 281, 283–84; 344, 732–33, 850. A neuropsychological evaluation in April 2018 found that J.S.'s cognitive ability was found to be in the "Above Average" range, with a "Full Scale IQ" in the 86th percentile, but also found that J.S. exhibited weaknesses in social and emotional functioning, mood vulnerabilities, attention and executive functioning, and written expression. *See* AR 282–91.

During the 2016–2017 school year, J.S. experienced what was "likely a Manic and then a Major Depressive Episode," which required him to take leave from school.  AR 189, 281.  Over the next two years, J.S. experienced "periods of psychosis, delusional religious thinking, and a serious suicide attempt and ideation," requiring multiple periods of hospitalization.  AR 189.

In August 2019, J.S. enrolled at Wilson High School in Washington, D.C. pursuant to an IEP.  *See* AR 189, 344, 756, 857.  In November 2019, he experienced another "episode of psychotic illness," for which he was again hospitalized.  AR 189.  He reportedly reacted poorly to an antipsychotic medication, and developed a state of catatonia that lasted for more than four weeks.  AR 189–90.  J.S. was hospitalized again in February 2020 after a "clear episode of mania."  AR 190.  As of May 2020, J.S. Student's psychiatric diagnoses were Bipolar Disorder, Autism Spectrum Disorder ("ASD"), ADHD-combined, and Specific Learning Disorder with impairments in reading and in written expression.  AR 190–91.

J.S. was hospitalized again in June 11, 2020, upon his request to be in a "safe space" and to have his medication adjusted.  *See* AR 392, 734, 871.

1.  The 2020 DCPS IEP and the District's Proposed Placement

After difficulties during the 2019–2020 school year—including multiple hospitalizations due to mental health challenges and the use of online learning prompted by the COVID-19 pandemic—J.S.'s parents sought to place J.S. in a full-time residential program.  *See* Hearing Officer Determination ("HOD") ¶¶ 8–9, AR 661.

On May 14, 2020, an IEP team held a meeting in which J.S.'s mother and counsel participated.  HOD ¶¶ 8–9, AR 661.  The IEP team agreed that J.S. required 26.5 hours per week of Specialized Instruction outside the general education setting and 240 minutes per month of Behavioral Support Services.  HOD ¶ 8, AR 661; May 2020 IEP, AR 149, 150.  The explanation

4

for J.S.'s for the "Behavioral Support Services" derives from J.S.'s "social emotional conditions," which require "acute behavioral supports that cannot be implemented inside the general education setting." May 2020 IEP, AR 150. The IEP does not provide for Extended School Year ("ESY") services. May 2020 IEP, AR 153; *see also* IEP Meeting Notes, AR 372 (Team agrees he . . . does not qualify for ESY services").

In addition to the above parameters, the IEP team agreed to three "annual goals" for J.S.: (1) to learn "5 coping strategies to manage a range of emotions . . . experienced and utilized in skills in all environments"; (2) to "learn and utilized at least 5 success skills, i.e., organization, attention to tasks, time-management, recording and submitting assignments"; and (3) to "learn and practice complex social skills; i.e., relational variance with others, communicating through conflict, perspective taking, judgment, nonverbal communication, etc., through the use of role play, worksheets, or structured activities in groups and/or individual sessions." May 2020 IEP, AR 147.

At the IEP meeting, J.S.'s counsel requested consideration of a full-time residential placement for J.S., at a school with a psychiatrist on staff. HOD ¶ 9, AR 661; Notes from May 2020 IEP Meeting, AR 162. The IEP team agreed to make a referral to the Office of the State Superintendent of Education ("OSSE") for a change-in-placement review to consider a residential placement. HOD ¶ 9, AR 661.

In the meantime, on June 15, 2020, Plaintiffs informed DCPS that J.S. had been accepted to Innercept Academy and requested that DCPS place J.S. there for the 2020–2021 academic year. HOD ¶ 13, AR 663 (citing June 15, 2020 Correspondence, AR 192). Plaintiffs noted that they did not believe that an appropriate special education program had been identified or offered by DCPS for the upcoming school year, and that if DCPS refused their request for funding, they reserved

their right to seek funding for their unilateral placement of J.S. at Innercept Academy.  HOD ¶ 13, AR 663 (citing June 15, 2020 Correspondence, AR 192).  Innercept is a for-profit residential treatment program located in Coeur d'Alene, Idaho.  HOD ¶ 23, AR 667.  Innercept is a facility of "last resort," and aims to teach its residents independent living.  HOD ¶ 23, AR 667.  It does not follow a school term, but instead offers rolling admissions and provides education for residents who need it.  HOD ¶ 24, AR 668.

On June 25, 2020, OSSE held a "change-in-placement" meeting during which OSSE accepted the IEP team's decision that J.S. required a residential placement and agreed to start the location assignment process.  HOD ¶ 10, AR 661–61; Notes from OSSE Placement Meeting, AR 395.  At the meeting, J.S.'s mother reported that J.S. would enroll at Innercept Academy on June 29, 2020 and requested that OSSE consider Innercept Academy for J.S.'s location placement.  HOD ¶ 10, AR 662; Notes from OSSE Placement Meeting, AR 395–96.  OSSE advised Plaintiffs that they must exhaust all programs on the OSSE-approved nonpublic school list.  HOD ¶ 10; AR 661–62; Notes from OSSE Placement Meeting, AR 396.  Innercept Academy has "not been evaluated by OSSE to ensure that it complies with applicable [D.C.] statutes and regulations for private schools serving students with disabilities."  HOD at 38, AR 692 (citing D.C. Code § 38–2561.07).

After the "change-in-placement" meeting, OSSE made referrals to residential programs on its list of approved schools.  HOD ¶ 11, AR 662.  On July 17, 2021, OSSE advised Plaintiffs that one of these schools, the Hughes Center, had accepted J.S. for enrollment.  HOD ¶ 11, AR 662.  OSSE also explained that the Hughes Center had a waitlist due to protocols implemented in response to the COVID-19 pandemic, which would delay J.S.'s ability to enroll by 12 to 14 weeks.  HOD ¶ 11, AR 662. (citing July 17, 2020 Email from Drew Yee, AR 398).  OSSE also notified

Plaintiffs that it would issue a Notice of Location Assignment for J.S. to attend the Hughes Center. HOD ¶ 11, AR 662; *see* Notice of Location Assignment, July 17, 2020, AR 402.

The Hughes Center is a for-profit therapeutic treatment center located in Danville, Virginia and offers "specialized residential treatment services" for individuals "who have been diagnosed with an Intellectual Disability and/or Autism Spectrum Disorder, and who are experiencing significant social and behavioral difficulties within the home, school or community environments." Hughes Center Website, AR 510.

On July 30, 2020, Plaintiffs conveyed to OSSE concerns regarding its proposal to place J.S. at the Hughes Center. HOD ¶ 14, AR 663; *see also* July 30, 2020 Email from Meghan Probert, AR 406–07. First, J.S.'s mother believed that the Hughes Center would not be a good fit for J.S. because she learned that many of the students had an Intellectual Disability Diagnosis or were nonverbal. HOD ¶ 14, AR 663; *see also* July 30, 2020 Email from Meghan Probert, AR 406–07. Second, J.S.'s parents were concerned about the Hughes Center's waitlist. HOD ¶ 14, AR 663; *see also* July 30, 2020 Email from Meghan Probert, AR 406–07. J.S.'s parents, through their counsel, again requested that J.S. be referred to Innercept, which they believed to be a more appropriate placement. HOD ¶ 14, AR 663–64. On the same day, OSSE responded that although the Hughes Center does serve students with Intellectual Disabilities, it also serves students diagnosed with Autism, and the admissions team at the Hughes Center agreed that its program could meet J.S.'s needs. HOD ¶ 15, AR 664; July 30, 2020 Email from Drew Yee (OSSE), AR 412–13. OSSE also advised Plaintiffs that DCPS should discuss with J.S.'s IEP team providing "comparable services" for J.S. pending enrollment at the Hughes Center. HOD ¶ 15, AR 664; July 30, 2020 Email from Drew Yee (OSSE), AR 412–13.

2.  Due Process Complaint & Administrative Hearing

On August 21, 2020, Plaintiffs filed an administrative due process complaint alleging that OSSE denied J.S. a FAPE by failing to offer an appropriate residential placement for the 2020–2021 school year.  Due Process Compl. at 1, AR 8.  Plaintiffs sought reimbursement for tuition and related costs paid to Innercept Academy since June 29, 2020 and prospective funding and placement at Innercept Academy through the end of the 2020–2021 school year.  Due Process Compl. at 7, AR 14.

A due process hearing before a Hearing Officer was held on October 28 and 20 and November 6, 2020.  HOD at 2, AR 656.  Both parties were represented by counsel.  Plaintiffs presented testimony from five witnesses: (1) Dr. Joseph Houston, a child psychiatrist; (2) Jennifer Fisher, an educational programming expert; (3) Stephen Yates, a clinical therapist at Innercept; (4) Chris Finch, Innercept's Director of Education and Vocation; and (5) A.D., J.S.'s mother.  Two witnesses testified on the District's behalf: (1) Katie Reda, a Special Programs Manager at OSSE; and (2) Michael Triggs, the Hughes Center's CEO.

3.  Hearing Officer Determination

The Hearing Officer issued a determination on November 17, 2020.  *See* HOD, AR 655. The Hearing Officer found that at the time OSSE made its location assignment for J.S. on July 17, 2020, the Hughes Center could fulfill the requirements set forth in J.S.'s IEP and therefore it was "an appropriate placement for [J.S.]."  HOD at 26–27, AR 680–81.

However, the Hearing Officer also concluded that OSSE had failed to show that it "took all reasonable steps to overcome the obstacles which delayed prompt implementation of [J.S.'s] residential placement."  HOD at 31, AR 685.  The Hearing Officer, therefore, found that OSSE's

"failure to provide a residential placement for [J.S.] near the start of the 2020–2021 school year was a denial of FAPE."  HOD at 31, AR 685.

Having concluded that OSSE denied J.S. a FAPE by "failing to implement" J.S.'s IEP requirement for a residential placement at the beginning of the 2020–2021 school year, the Hearing Office next considered whether Plaintiffs' unilateral placement of J.S. at Innercept Academy was "reasonably calculated" to enable J.S. to "make progress appropriate in light of [J.S.'s] very challenging circumstances," allowing them to seek reimbursement for tuition and fees.  HOD at 34, AR 688.  The Hearing Officer granted Plaintiffs reimbursement for the first semester of the 2020–2021 school year, but denied reimbursement for the summer of 2020 because J.S.'s IEP did not provide for extended school year services.  HOD at 37, AR 691.

Plaintiffs also requested that the Hearing Officer order OSSE to fund J.S.'s continued placement at Innercept Academy for the remainder of the 2020–2021 school year.  *See* Due Process Compl. at 7, AR 14.  The Hearing Officer denied this request for prospective placement and funding, noting that Innercept Academy "cannot fulfill [J.S.'s] IEP."  HOD at 38, AR 692.  The Hearing Officer noted, for example, that J.S.'s IEP provides for 26.5 hours of Specialized Instructive Services, but Innercept Academy provides only 17.5 of school per week and offers no special education services taught by special education teachers.  HOD at 38, AR 692.  In contrast, the Hughes Center offer 27.5 hours of instruction per week and employs a psychiatrist on its staff.  HOD ¶¶ 19–20, AR 666–67.  The Hughes Center also employs licensed therapists who meet with each student twice per week and provide weekly family therapy and family engagement. HOD ¶ 20, AR 667; *id.* at 24, AR 678.  The Hughes Center holds a "Certificate of Approval" issued by OSSE.  HOD ¶ 19, AR 667.

The Hearing Officer concluded that OSSE had demonstrated that its location assignment (the Hughes Center) could fulfill the requirements set forth in the May 2020 IEP and therefore was an "appropriate placement" for J.S.  HOD at 26–27, AR 680–81.  The Hearing Officer ordered OSSE to fund J.S.'s placement at Innercept Academy through January 29, 2021, the end of DCPS's term, "[i]n order not to unduly disrupt [J.S.'s] education and therapy," but not beyond that date. HOD at 38–39, AR 692–93.  Finally, the Hearing Officer noted that his decision regarding J.S.'s prospective placement for the remainder of the 2020–2021 school year was "without prejudice as to any decision by OSSE, with the concurrence of [Plaintiffs] and [J.S.'s] IEP team, to further extend [J.S.'s] placement at [Innercept Academy]."  HOD at 38–39, AR 692–93.  J.S. did not enroll at the Hughes Center.  *See* Mem. Op. at 8, ECF No. 20.

## C. Procedural Background

Plaintiffs filed their Complaint in this action on February 1, 2021, seeking review of the Hearing Officer's conclusion that OSSE's proposed placement of J.S. at the Hughes Center was appropriate and that OSSE was not required to fund J.S.'s placement at Innercept Academy for the summer of 2020 and for the second half of the 2020–2021 school year.  *See* Compl., ECF No. 1.

On March 16, 2021, Plaintiffs filed a [9] Motion for Preliminary Injunction, seeking injunctive relief under IDEA's "stay-put" provision, 20 U.S.C. § 1415(j).  Plaintiffs argued that Defendant's failure to fund J.S.'s placement at Innercept Academy for the second half of the 2020–2021 school year constituted a "change" in his "current educational placement."  *See* Mem. Op. at 10–11, ECF No. 20.  The Court denied Plaintiffs' motion, concluding that Plaintiffs had not demonstrated that Innercept Academy was J.S.'s "current educational placement."  *Id.*  In reaching this decision, the Court observed that the Hearing Officer had determined that Innercept Academy

"*cannot* fulfill" J.S.'s IEP, whereas the Hughes Center "could fulfill the requirements set forth in the Student's DCPS IEP." *Id.* at 13–14 (citing HOD at 26, 38, AR 680, 692).

After the denial of Plaintiffs' motion, the parties filed cross-motions for summary judgment, which are ripe for the Court's consideration.

## II.   LEGAL STANDARD

The IDEA requires that the school system offer an IEP that is reasonably calculated to enable a disabled student to make progress in light of his or her particular circumstances. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. School Dist. RE-1*, 137 S. Ct. 988, 992, 998–99 (2017); *cf. Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty v. Rowley*, 458 U.S. 176, 188–89 (1982) ("According to the definitions contained in the Act, a 'free appropriate public education' [FAPE] consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction.").

Under the IDEA, a "party aggrieved by the findings and decision" of the hearing officer may bring a civil action in federal court "without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The court "shall receive the records of the administrative proceedings," "shall hear additional evidence at the request of a party," and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(C); *see Rowley*, 458 U.S. at 205–06 (requiring the court to "make an independent decision based upon a preponderance of the evidence" in determining whether a school system provided a student with a FAPE). Where, as here, neither party has requested that the Court hear additional evidence, "a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." *Holzclaw v. Dist. of Columbia*, 524 F. Supp. 2d 43, 47 (D.D.C. 2007)

(quoting *T.T. v. Dist. of Columbia*, Civil Action No. 06-0207 (JDB), 2007 WL 2111032, at *3 (D.D.C. July 23, 2007)).

"Courts sitting on an [IDEA] appeal do not have unfettered review but must . . . give due weight to the administrative proceedings and afford some deference to the expertise of the hearing officer and school officials responsible for the child's education." *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 108–09 (D.D.C. 2010) (quotation marks omitted) (quoting *Lyons v. Smith*, 829 F. Supp. 414, 418 (D.D.C. 1993)).  "[A] hearing officer's findings 'based on credibility determinations of live witness testimony' are given 'particular deference' where there is no supplementation of the record." *McAllister v. Dist. of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014) (citation omitted).  The hearing officer is also "best positioned" to "resolve factual disputes that amount to inconsistent testimony." *J.T. v. Dist. of Columbia*, 496 F. Supp. 3d 190, 207 (D.D.C. 2020).  "[W]hile a certain amount of deference should be accorded to the knowledge and expertise of the hearing officer, courts will accord less deference if the hearing officer's determination lacks reasoned and specific findings." *M.O. v. Dist. of Columbia*, 20 F. Supp. 3d 31, 40 (D.D.C. 2013).

The party challenging the administrative decision carries the burden of proof of "persuading the court that the Hearing Officer was wrong." *Turner v. Dist. of Columbia*, 952 F. Supp. 2d 31, 35 (D.D.C. 2013) (quoting *Reid*, 401 F.3d at 521).

## III.   DISCUSSION

Plaintiffs contend that the District failed to provide J.S. with a FAPE for the 2020–2021 school year by proposing an inappropriate placement for him.  *See* Pls.' Mot. at 1.  Plaintiffs argue that the Hearing Officer erred in concluding that the Hughes Center was an appropriate placement, due to its lack of group therapy, inappropriate "peer group" for J.S. and inability to treat residents

with active psychosis. *See id.* at 23–32.  Plaintiffs also allege that the Hearing Officer improperly

"excused" Defendant's lack of expert testimony and failure to provide a "cogent and responsive"

explanation for its placement, and that the Hearing Officer gave inappropriate deference to

Defendant's witnesses.  *See id.* at 15–20.  Plaintiffs further argue that  the Hearing Officer should

have (and failed to) take into consideration J.S.'s unique needs, his progress at Innercept Academy,

and the difficulty in transferring to a new school in the middle of the year.  *See id.* at 20–23,

32–30.  Based on these claimed deficiencies, Plaintiffs seek reimbursement for J.S.'s attendance

at Innercept Academy during the summer of 2020 and the second half of the 2020–2021 school

year.[2]  Defendant has cross-moved for summary judgment, contending that it has provided J.S.

with a FAPE and that the Hearing Officer's decision that the Hughes Center was an appropriate

placement was correct.  *See* Def.'s Cross-Mot. & Opp'n at 2.

Before addressing each party's arguments, the Court must clarify that the services included

in J.S.'s May 2020 IEP are *not* at issue in this case.  *See* HOD at 3, 16, AR 657, 670.  J.S.'s mother

indicated during the due process hearing that she agreed with the services and goals specified in

the IEP, and that J.S. should be placed in a residential treatment program.  *See* AR 880–82.  Instead,

Plaintiffs challenge the Hearing Officer's conclusion that Defendant's proposed *placement* of J.S.

at the Hughes Center was appropriate.  The Court shall begin with Plaintiffs' specific challenges

to that conclusion, before addressing Plaintiffs' challenges to the HOD as a whole.

### A. Propriety of Proposed Placement at the Hughes Center

Plaintiffs contend that the Hearing Officer erred in concluding that the Hughes Center was

an appropriate placement for J.S.  They argue that, contrary to the Hearing Officer's finding, the

Hughes Center could not implement J.S.'s IEP because that program does not offer group therapy.

---

[2] Neither party challenges the HOD to the extent it awarded Plaintiffs tuition reimbursement for J.S. attendance at Innercept the first half of the 2020–2021 school year.

*See* Pls.' Mot. at 25–29.  They also argue that the Hearing Officer improperly focused only on the ability of the Hughes Center to implement J.S.'s IEP, without addressing the concerns highlighted by Plaintiffs and their witnesses about the Hughes Center's "lack of appropriate peers" for J.S. and its inability to address the needs of a student with "active psychosis."  *See id.* at 29–32.  Plaintiffs also contend that the Hearing Officer improperly failed to consider how J.S. was progressing at Innercept when deciding whether Hughes was an appropriate placement.  *Id.* at 34–38.  Before addressing these challenges to the HOD, the Court presents the legal framework for evaluating an appropriate location placement under the IDEA.

"The IDEA requires school districts to offer placement in a school and in programming that can fulfill the requirements set forth in the student's IEP."  *Middleton v. Dist. of Columbia*, 312 F. Supp. 3d 113, 143 (D.D.C. 2018) (citing *O.O. ex rel. Pabo v. Dist. of Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008)).  "Under the IDEA, an appropriate location of services is one which can implement a student's IEP and meet his specialized educational and behavioral needs."  *T.M. v. Dist. of Columbia*, 75 F. Supp. 3d 233, 243 (D.D.C. 2014) (quoting *James v. Dist. of Columbia*, 949 F. Supp. 2d 134, 139 (D.D.C. 2013)). "A student's IEP determines whether an educational placement is appropriate; the placement does not dictate the IEP."  *S.S. ex rel. Street v. Dist. of Columbia*, 68 F. Supp. 3d 1, 18 (D.D.C. 2014) (citing *Roark v. Dist. of Columbia*, 460 F. Supp. 2d 32, 44 (D.D.C. 2006); *Spielberg v. Henrico Cty. Public Sch.*, 853 F.2d 256, 258 (4th Cir. 1988) ("Educational placement is based on the IEP, which is revised annually.")).

Courts consider a number of factors when evaluating the appropriateness of the location of services, including "the nature and severity of the student's disability, the student's specialized educational needs, the link between those needs and the services offered by the private school, the placement's cost, and the extent to which the placement represents the least restrictive

environment." *Branham v. Dist. of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005).  The school district's placement "need not satisfy a parent's every desire and need not represent the best possible programming for the student." *Middleton*, 312 F. Supp. 3d at 142; *see also Kerkam v. McKenzie*, 862 F.2d 884, 886 (D.C. Cir. 1988) ("[P]roof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the Act."); *Holland v. Dist. of Columbia*, 71 F.3d 417, 419 (D.C. Cir. 1995) (The IDEA "does not necessarily guarantee the child [with a disability] the best available education.").

Before raising specific challenges to the Hearing Officer's conclusion that the Hughes Center was an appropriate placement, Plaintiffs contend that the HOD generally failed to address J.S.'s "unique needs."  *See* Pls.' Mot. at 20–23.  But, again, Plaintiffs do not dispute that they agreed to the operative *IEP*, which is the proper "means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181).  Moreover, Plaintiffs ignore the detailed factual findings the Hearing Officer made with respect to J.S.'s recent educational history, psychiatric illnesses, and learning difficulties, *see* HOD ¶¶ 1–7, AR 4–6, as well as the resources available at the Hughes Center that correspond with the services and goals prescribed in the IEP, *see* HOD ¶¶ 17–21, AR 11–20.  The Court, therefore, disagrees that the Hearing Officer failed to consider the "nature and severity of the [J.S.'s] disability, [his] specialized educational needs, [or] the link between those needs and the services offered by the private school." *Branham v*, 427 F.3d at 12.

The Court turns next to Plaintiffs' specific challenges to the Hearing Officer's conclusion that the Hughes Center was an appropriate placement for J.S.  For the reasons set forth below, the Court finds that Plaintiffs have not carried their burden of demonstrating that the Hearing Officer's determination that the Hughes Center was appropriate placement was incorrect.  Accordingly,

Defendant has made available to J.S. a FAPE at the Hughes Center for the second half of the 2020–2021 school year and Plaintiffs are not entitled to tuition reimbursement for J.S.'s attendance at Innercept during that period.

      1.  <u>Group Therapy</u>

Plaintiffs contend that J.S.'s IEP "contemplates" group therapy, which the Hughes Center does not offer. Pls.' Mot. at 25–29. Plaintiffs, therefore, argue that the Hughes Center was an inappropriate placement because it could not implement J.S.'s IEP. *Id.*

The Hearing Officer found that the IEP at issue in this case does not provide for group therapy. HOD at 26, AR 680. Plaintiffs challenge the Hearing Officer's conclusion, claiming that group therapy is "contemplated" in J.S.'s IEP. Pls.' Mot. at 25. In support of their argument, Plaintiffs rely on "social/emotional" goals contained in the IEP. Pls.' Mot. at 27. One such goal directs that "[J.S.] will learn and practice complex social skills; i.e. relational variance with others, communicating through conflict, perspective taking, judgment, nonverbal communication, etc. through the use of role play, worksheets, or structured activities in *group and/or individual sessions* with 75% accuracy." May 2020 IEP, AR 147 (emphasis added).

Plaintiffs themselves concede that the IEP "does not specify whether the behavioral support services" contained in the IEP "will be provided in *an individual or group setting*." Pls.' Mot. at 25, 27 (emphasis added); *see also* Pls.' Reply & Opp'n at 4 ("J.S.'s IEP does not specify whether his behavioral support services would be provided in an individual or group setting."). In so doing, they recognize that the IEP itself does not explicitly call for group therapy. As the Court must focus on the text of the "written document," it concludes that the Hearing Officer did not err in concluding that the IEP does require group therapy. *N.W. v. Dist. of Columbia*, 253 F. Supp. 3d 5, 14 (D.D.C. 2017) ("Multiple jurisdictions have recognized that the IDEA supports focusing on

the written document to create a clear record and reduce factual disputes.").  Therefore, Defendant

cannot "be faulted for failing to satisfy conditions that are not memorialized in the IEP."  *J.T. v.*

*Dist. of Columbia*, 496 F. Supp. 3d at 208 ("Since the IEP does not require that V.T.'s placement

be within a certain distance of his home, DCPS has not denied him a FAPE by failing to place him

at a close-in school.").  The "appropriate course of action would be to update [the] IEP to include

these [requirements]."  *Id.*

Plaintiffs raise no other challenge to the Hearing Officer's conclusion that the Hughes

Center could "substantially implement" J.S.'s IEP.  HOD at 24, AR 678.

### 2.  Peer Group

Plaintiffs next contend that the Hearing Officer focused too narrowly on the Hughes

Center's ability to implement J.S.'s IEP, and ignored other concerns, including the alleged "lack

of appropriate peer group" at the Hughes Center.  *See* Pls.' Mot. at 24–25, 29–31.  Plaintiffs note

that J.S. has "strong cognitive abilities," but "needs to work on his social skills."  *Id.* at 29.  They

argue that the Hughes Center cannot offer an appropriate "peer group" for J.S. because some of its

residents are intellectually disabled and have demonstrated aggressive behaviors.  *Id.*

At the due process hearing, Plaintiffs' psychiatric expert, Dr. Houston, testified that "J.S.

need[s] a program with peers who are as intelligent or more intelligent than he [is] in order to make

the appropriate kinds of gains in social skills that he would need to make."  AR 737–38.  Plaintiffs'

special educational programming expert, Ms. Fisher, *see* AR 753–54, opined that, based on her

understanding of the Hughes Center's student population, it "does not match with [J.S.'s] profile."

AR 771.  Both experts also testified that they were concerned about J.S. being around students

with Oppositional Defiant Disorder or demonstrated aggressive behaviors.  For example, Dr.

Houston explained that, "because of [J.S.'s] anxiety about his own social deficits, he frequently

turns to imitating the people around him."  AR 737–38.  Ms. Fisher testified that J.S. "does not demonstrate aggressive behaviors" and stated her "fear that he would absorb those behaviors."  AR 768.

The parties' witnesses presented conflicting testimony about the Hughes Center's student population.  Plaintiffs' expert, Ms. Fisher, testified that she had spoken by telephone with the Hughes Center's Chief Operating Officer ("COO"), who reported that "all" students at the Hughes Center were coded with Intellectual Disabilities and were "low functioning," and that all students there have a history of aggressive behaviors and low cognitive scores.  *See* AR 759, 766–68.  Ms. Fisher also testified that the Hughes Center's COO told her that only two residential students at the Hughes Center were on the "high school diploma track."  AR 767–68.  There is no indication on the record that Ms. Fisher ever visited the Hughes Center.  The COO was not called as a witness at the due process hearing.

Defendant called as a witness Mr. Triggs, the Chief Executive Officer ("CEO") of the Hughes Center, who is responsible for its day-to-day operations.  AR 930.  Much of his testimony conflicted with Ms. Fisher's report of what the COO told her about the Hughes Center's students.  For example, Mr. Triggs testified that about half of the Hughes Center's students have an intellectual disability, and the other half have an autism diagnosis.  AR 959, 972.  He also testified that approximately 8–12 students were on the "diploma track" (as J.S. would have been) and none of those students has an intellectual disability.  AR 960, 972, 989–90.  Moreover, Mr. Triggs testified that even though the Hughes Center students often have histories of aggression, they do not necessarily show aggression while there.  AR 957–58, 971, 990.  And, he noted that "independent children with autism" are housed in their own "cottage"  and take classes together. AR 1003, 1006.

Plaintiffs claim that the Hearing Officer "ignored" their concerns about an appropriate "peer group" for J.S. at the Hughes Center.  The Court disagrees with Plaintiffs' characterization. The Hearing Officer's analysis specifically addresses the concerns raised by Plaintiffs about an appropriate "peer group" at the Hughes Center.  HOD at 24–26, AR 678–80.  The Hearing Officer noted Plaintiffs' concern that the Hughes Center "is not appropriate" for J.S. because of the "student make-up at the facilities, including that the majority of the center's students have an intellectual disability or are functioning below [J.S's] academic and adaptive skills level and most of the student population had a history of aggression before being sent [there]."  HOD at 24–25, AR 678–79.  However, he also explained that the Hughes Center's student population is "made up of approximately equal numbers of children who do, and do not, have intellectual disabilities" and that J.S. would "be group, both in the classroom and in the residential cottage, with more independently functioning students."  HOD at 25, AR 679.  And he noted, although many of the Hughes Center's student's had histories of aggressive behavior, they "do not necessarily show aggression" once they are at the Hughes Center.  HOD at 25, AR 679.  Finally, the Hearing Officer pointed out that J.S.'s IEP does not require him to be "separated from other students who may be lower functioning or have histories of aggression."  HOD at 26, AR 680.

In reaching these decisions, the Hearing Officer explained how he weighed conflicting testimony from the parties' witnesses about the Hughes Center's student population.  He noted that the COO was not called to testify as a witness and so the COO's alleged out-of-court statements (as recounted by Ms. Fisher) were entitled to "less probative weight than the sworn testimony of the [CEO]," Mr. Triggs, who "testified at length under oath."  HOD at 11 n.2, AR 665.  He further "discount[ed] the opinions of [Ms. Fisher] to the extent they were based on the alleged statements of COO and not on on-site observations at the facility."  HOD at 11 n.2, AR

665.  The Court sees no error with this reasoning.  Plaintiffs are incorrect that the Hearing Officer

"ignored" their concerns about an appropriate peer group.

    3.  <u>State of Active Psychosis</u>

    Plaintiffs further argue that the Hearing Officer erroneously "ignored" that J.S. was in an

active state of psychosis in June 2020 and that the Hughes Center could "not have programmed

for J.S. upon his arrival . . . because of his psychological state."  Pls.' Mot. at 31.  They cite to Mr.

Triggs' testimony, in which he stated that the Hughes Center does not treat children who are in

"psychiatric distress," but that it "work[s] to get them to the correct level of care."  *Id.* at 32 (citing

AR 991).  However, Mr. Triggs also testified that the Hughes Center has admitted students who

have a history of psychosis, but are being maintained on medication.  AR 1008.

    Although it is "undisputed" that when J.S. enrolled at Innercept in June 2020 he was "in

an active state of psychosis," it is also undisputed that the Hughes Center could not have admitted

him at that time.  Moreover, as Defendant notes, when he arrived at Innercept Academy in such

an "acute psychotic state," he was "not receptive to *any* educational programming," but instead

was placed "in a separate facility and remained there for almost four weeks until he stabilized and

his medication was regulated.  Def.'s Reply at 4 (citing AR 793, 795–96); *see also* Pls.' Mot. at

32 ("J.S. spent most of the first month he arrived at Innercept in the stabilization unit and was not

able to attend class at all.").  It appears from the record that, by the time J.S. would have enrolled

at the Hughes Center in January 2021, his state of "active psychosis" had ceased.  *See* AR at 795.

    4.  <u>Response to Innercept's Programming</u>

    Plaintiffs also argue that the Hearing Officer should have "consider[ed] J.S.'s positive

response to the programming at Innercept when considering the appropriateness of the proposed

program at Hughes," but failed to do so.  Pls.' Mot. at 35.  However, Plaintiffs *again* rely on legal

authority directing that a school district should consider a student's progress in his or her academic program when *formulating an IEP*. *See, e.g.*, *id.* at 36.  The IEP is not at issue here.

Moreover, Plaintiffs do not dispute the Hearing Officer's conclusion that Innercept *cannot* implement J.S.'s IEP.  *See* HOD at 38, AR 692.  Notably, the Hearing Officer found that Innercept Academy provides "17.5 hours of school per week" and "offers no special education services taught by special education teachers," whereas the IEP provides for J.S. to receive "26 hours per week of Specialized Instruction Services."  HOD at 38, AR 692.  The District was required to offer placement "in a school and in programming that can fulfill the requirements set forth in the student's IEP,"  *Middleton*, 312 F. Supp. 3d at 143.   As Innercept could not meet these requirements, it is unclear to the Court why the Hearing Officer "should have" considered the available programming at Innercept in assessing whether the Hughes Center was an appropriate placement.  *See, e.g.*, *Kerkam*, 862 F.2d at 889 (explaining that where a student was making progress at one school and might not make "the same gains" at a second school, the second school was not inappropriate simply because it was inferior, so long as it provided "some educational benefit" for the child); *Cooper v. District of Columbia*, No. CV 14–00102, 2014 WL 7411862, at *4–5 (D.D.C. Dec. 30, 2014) (holding that where DCPS provided an appropriate placement, "it cannot be required to pay for the education plaintiff would prefer").

\*\*\*

Plaintiffs have not carried their burden of demonstrating that the Hearing Officer was incorrect in concluding that the Hughes Center was an appropriate placement for J.S.  The Court turns to Plaintiffs' remaining arguments, which focus on additional considerations that the Hearing Officer purportedly failed consider in his analysis.

**B. Plaintiff's Arguments Regarding Information the Hearing Officer Failed to Consider**

1. <u>Explanation for Placement, Expert Testimony, and the District's Knowledge of J.S.</u>

Plaintiffs next argue that the Hearing Officer's Decision was flawed because he failed to consider the "lack of explanation" from Defendant supporting J.S.'s proposed placement and failed to account for OSSE's "lack of expertise" in selecting the Hughes Center as an appropriate placement and "lack of knowledge" about J.S.  *See* Pls.' Mot. at 15–20.  None of these arguments compels reversal of the Hearing Officer's Decision.

In response to the first point, Defendant indicates that it "selected Hughes as J.S.'s location of services . . . quite simply, because Hughes can implement the May 2020 IEP."  Def.'s Opp'n & Cross-Mot. at 15.  Defendant cites the testimony of Ms. Reda, who described the procedures followed by OSSE in examining the services prescribed by J.S.'s IEP and ensuring that the programs to which J.S. was referred could offer those services.  *See id.* at 15-–16 (citing AR 905–906, 910).  As previously noted, Plaintiffs here *do not challenge* the IEP itself, and other than their objection that the Hughes Center does not offer group therapy (which the Court rejected *supra* Section III(A)(1)), Plaintiffs *do not dispute* that the Hughes Center can "substantially fulfill the requirements for services in [J.S.'s] IEP."  HOD at 23, AR 677.  The Hearing Officer considered the services specified in J.S.'s IEP, considered the testimony of Defendant's witnesses regarding the services offered by the Hughes Center, and concluded that the Hughes Center could implement J.S.'s IEP.  *See* HOD at 23–25, 677.  As it is the " student's IEP" that "determines whether an educational placement is appropriate," *Street*, 68 F. Supp. 3d at 18, the Court agrees with the Hearing Officer's conclusion that Defendant sustained its burden of demonstrating that the Hughes Center was an appropriate placement for J.S., *see* HOD at 26, AR 680.

Plaintiffs also argue that the Hearing Officer's Decision incorrectly "defers" to the testimony of Defendant's witnesses, who were not "experts" and lacked knowledge about J.S.'s individual needs.  *See* Pls.' Mot. at 15; Pls.' Reply & Opp'n at 3.  Plaintiffs contend that they presented "expert witnesses with firsthand knowledge of J.S. and his educational needs," whereas Defendants "did not even attempt to present any expert testimony at all." Pls.' Mot. at 15 at 17; *see also* Pls.' Reply & Opp'n at 3.  According to Plaintiffs, therefore, their "witnesses' testimony clearly merited significant weight and deference," which the Hearing Officer failed to accord.  *Id.*

The Court finds no error in the HOD as to any of these points. That Defendant's witnesses did not know J.S. personally did not require the Hearing Officer to discount their testimony.  *See D.K. v. Dist. of Columbia*, 983 F. Supp. 2d 138, 148 (D.D.C. 2013).  Moreover, as previously noted, the HOD *does* address Plaintiffs' witnesses' testimony pertaining to their "concerns" with J.S.'s proposed placement at the Hughes Center.  *See* HOD at 24–25, AR 678–79.  The Hearing Officer plainly took into consideration opinions offered by Dr. Houston and Ms. Fisher that the Hughes Center was not "appropriate for [J.S.] primarily because of the student make-up at the facility," including that some of its students "have an intellectual disability or are functioning below the Student's academic and adaptive skills level" and that most of its population "had a history of aggression."  HOD at 24, AR 678.  He explicitly acknowledged that Plaintiffs' expert witnesses both "opined that this student mix was not appropriate for [J.S.] who has a propensity to imitate the behavior of peers."  HOD at 25, AR 679.  The Hearing Officer went on to weigh this testimony against Mr. Triggs' testimony that J.S. would be grouped with "more independently functioning students" (not students with intellectual disabilities) and that even students with past aggressive behavior do not necessarily  exhibit aggressive behavior once they begin at the Hughes Center.  HOD at 25, AR 679.  In other words, the Hearing Officer *did* consider Plaintiffs' experts

opinions and "concerns" about J.S.'s placement at the Hughes Center—but considered this testimony together with Mr. Triggs' testimony about the Hughes Center's students and ability to implement J.S.'s IEP.

As a final point, Plaintiffs cite no legal authority for the proposition that, in cases addressing whether a school district's *placement* is appropriate, the school district is required to offer expert testimony.  Plaintiffs contend that this case is analogous to *M.O. v. District of Columbia*, 20 F. Supp. 3d 31 (D.D.C. 2013), in which the court found that the hearing officer's decision "[did] little to address the concerns raised by [several educational] professionals" in developing an IEP.  *Id.* at 41.  But nothing in that case mandates that the District proffer expert testimony at all, much less that it is required to do so to justify its *placement* decision when the sufficiency of the IEP is not in dispute.  In this case, the Court finds no error in the Hearing Officer's decision to credit Mr. Triggs' testimony about the student composition and services offered by the Hughes Center as opposed to Ms. Fisher's testimony about the Hughes Center's students (which was based on hearsay) even though Mr. Triggs was not offered as an "expert."

### 2. Effects of Mid-Year Transfer

Based on his conclusion that the Hughes Center was an appropriate placement for J.S., the Hearing Officer declined to order OSSE to fund J.S.'s placement at Innercept Academy for the second half of the 2020–2021 academic year.  *See* HOD at 38, AR 692.  He did, however, order J.S.'s continued placement at Innercept through "the end of DCPS's second term, which ends on January 29, 2021," in order "not to unduly disrupt [J.S.'s] education and therapy" at Innercept. HOD at 38, AR 692.  Plaintiffs contend that the Hearing Officer's decision not to order J.S.'s continued placement at Innercept failed to consider "seemingly obvious harmful effects of moving a child out of a placement mid-year." Pls.' Mot. at 33.  Defendant counters that there is "no bar"

on transferring a student during the school year, where, as here the student has spent only one semester at a program. *See* Def.'s Cross-Mot. & Opp'n at 21.

In support of their argument that the Hearing Officer should have considered the effects of a mid-year transfer, Plaintiffs rely *Holmes v. District of Columbia*, 680 F. Supp. 40 (D.D.C. 1988). *See* Pls.' Mot. at 33–34.  In that case, the court concluded that it would be "inappropriate" to transfer a high school student away from a high school where he had spent at least two school years and when he was months away from graduating.  *Holmes*, 680 F. Supp at 41–42.  But, as Defendant notes, that case is factually distinct.  First, in *Holmes*, the court concluded that the "new" school proposed by the District was not an appropriate placement, as there was no indication that it could implement the student's IEP.  *Id.* at 44.  Here, the Hearing Officer concluded that the Hughes Center was an appropriate  placement and *can* implement the May 2020 IEP.  Second, the student in *Holmes* had attended his current school for several years; here, J.S. had attended Innercept for only one semester.  Def.'s Cross-Mot. & Opp'n at 21.  In contrast, in a more recent case in this jurisdiction, the court found no error with a HOD that required a student to transfer mid-year when the student's parents were put on notice of the proposed placement in advance of the school year, where the hearing officer heard credible testimony that the "new" school was capable of implementing the IEP and could accommodate a transfer.  *K.B. v. Dist. of Columbia*, Civil Action No. 13-649 (RC), 2015 WL 5191330, at *14–15 (D.D.C. Sept. 4, 2015).

As a final point, the Hearing Officer did direct Defendant to pay for J.S.'s continued placement through January 29, 2021—more than two months after the HOD was issued.  He explicitly ordered this relief  in order "not to unduly disrupt [J.S.'s] education and therapy." HOD at 38, AR 692.  In other words, the Hearing Officer did recognize potential disruption and afforded Plaintiffs additional time to prepare for a transfer.

### C. Plaintiffs' Remaining Arguments

The Court concludes by addressing two remaining arguments raised by Plaintiffs regarding purported errors made by the Hearing Officer.

First, Plaintiffs argue that the Hearing Officer "erred" in finding that they had not properly notified OSSE of their rejection of the Hughes Center as J.S.'s placement. Pls.' Mot. at 39–41. After concluding that Defendant had denied J.S. a FAPE for the first half of the 2020–2021 school year by failing to secure a placement at the start of the term, the Hearing Officer considered whether tuition reimbursement for the cost of Innercept was warranted. The Hearing Officer noted that regulations implementing the IDEA authorize a hearing officer to reduce or deny reimbursement for the cost of private school if the parents failed to give written notice to the public agency ten business days prior to the removal of the child. *See* HOD at 34, AR 688 (citing 34 C.F.R. § 300.148(d)). The Hearing Officer found that Plaintiffs here did not provide notice "*after* OSSE notified them on July 17, 2020 that it was assigning [J.S.] to [the Hughes Center]," and therefore they failed to provide the "statutorily required notice" rejecting the District's proposed placement. HOD at 35–36, AR 689–90. However, the Hearing Officer *did* consider that the parents *had* rejected "*in advance*" any placement of [J.S.] at an OSSE-approved school. HOD at 35, AR 689 (emphasis added). And, he did *not* reduce the amount by which they would be reimbursed for the first semester of J.S.'s attendance at Innercept. HOD at 37, AR 691 ("I conclude, therefore, that it would not be equitable to deny the parents reimbursement on account of their not notifying OSSE of their rejection of the [Hughes Center] before they unilaterally placed [J.S.] [at Innercept]." HOD at 37, AR 691. Based on this outcome, the Court sees no reason to reverse the HOD as to this point.

Second, Plaintiffs contend that they are entitled to reimbursement for J.S.'s attendance at Innercept beginning from the date he started there in June 2020.  *See* Pls.' Mot. at 44.  The Hearing Officer awarded Plaintiffs reimbursement for J.S.'s attendance at Innercept from August 17, 2020 through January 29, 2021.  *See* HOD at 37 n.7, 38, AR 691, 692.  The Hearing Officer declined to award reimbursement for the summer period because the IEP was "developed for the 2020–2021 regular school year and did not provide for Extended School Year (ESY) services.  Therefore, OSSE was only required to offer a nonpublic school placement to [J.S.] in time for the beginning of the 2020–2021 school year."  HOD at 37, AR 691.  Plaintiffs do not dispute that the May 2020 does not provide for ESY services.  Accordingly, they have failed to demonstrate that the Hearing Officer was incorrect to deny reimbursement for that period.

## IV.   CONCLUSION

The Court concludes that Plaintiffs have not demonstrated by a preponderance of the evidence that the Hearing Officer was incorrect in concluding that the Hughes Center was an appropriate placement and declining to award Plaintiffs reimbursement for the cost of J.S.'s attendance at Innercept other than for the first half of the 2020–2021 school year.  Accordingly, for the foregoing reasons, the Court **DENIES** Plaintiffs' [23] Motion for Summary Judgment and **GRANTS** Defendant District of Columbia's [24] Cross Motion for Summary Judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

            /s/
         COLLEEN KOLLAR-KOTELLY
         United States District Judge

Date: March 22, 2022